**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JOSEPH MICHAEL PETTAWAY**,

        **Movant,**

**v.**                       **Civil Action No. 2:15-cv-01277
(Criminal Case No: 3:12-cr-00196)**

**UNITED STATES OF AMERICA**,

        **Respondent.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, (ECF No. 103), and Movant's Motion for the Appointment of Counsel. (ECF No. 107). This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and by Standing Order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the undersigned respectfully **RECOMMENDS** that the presiding district judge **DENY** Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255. Given that the undersigned conclusively **FINDS** that Movant is not entitled to the relief requested, Movant's motion for the appointment of counsel is **DENIED**. Similarly, an evidentiary hearing is not warranted. *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970).

## I.    Relevant Background

On October 2, 2012, Movant Joseph Michael Pettaway ("Pettaway") was indicted by a federal grand jury on two counts of using the United States Postal Service to deliver threatening communications to a known person in violation of 18 U.S.C. § 876(c). (ECF No. 1).[1] At the time, Pettaway was serving a state sentence and was awaiting transfer to federal custody upon conclusion of his state sentence to begin serving a pending federal sentence. (ECF No. 16). On January 24, 2013, Pettaway entered into an agreement with the United States in which he pled guilty to the first count of the indictment in exchange for dismissal of the other count. (ECF No. 40 at 1). In the written agreement, Pettaway acknowledged that he had read and carefully discussed every part of the agreement with his counsel and understood the terms of the agreement. (*Id.* at 7). He also confirmed the following:

> I further acknowledge that my attorney has advised me of my rights, possible defenses, the Sentencing Guideline provisions, and the consequences of entering into this agreement, that no promises or inducements have been made to me other than those in this agreement, and that no one has threatened me or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

(*Id.*). Pettaway accepted an adjusted offense level of 14 under the Sentencing Guidelines, starting with a base offense level of 12 and adding two levels to account for the number of threats mailed by Pettaway (in excess of two). (*Id.*). Pettaway expressly acknowledged that the Court and the Probation Office were not bound by this calculation under the Sentencing Guidelines, and "the parties shall not have the right to withdraw from the plea agreement due to a disagreement with the Court's calculation of the appropriate

---

[1] All citations to the record refer to the documents filed in Pettaway's underlying criminal action.

guideline range." (ECF No. 40 at 4).

Finally, Pettaway signed a Stipulation of Facts, detailing the behavior underlying the offense of conviction and the relevant conduct for that offense. (*Id.* at 8-9). In particular, Pettaway stipulated that beginning in 2000 and continuing into 2012, he mailed his ex-girlfriend multiple letters, which contained threats to violently attack her upon his release from prison. (*Id.*). He further acknowledged that on October 6, 2011, he sent his ex-girlfriend a letter in which he threatened to repeatedly rape and beat her, and to shoot her if she tried to escape. To bolster his threat, Pettaway enclosed with the letter a copy of a prison disciplinary report describing his assault of a fellow inmate that resulted in second-degree burns to the inmate. (*Id.*).

On January 28, 2013, the presiding district judge convened a plea hearing pursuant to Rule 11, *Fed. R. Crim. P.* At the outset of the hearing, the Court questioned Pettaway regarding his education, literacy, and competency. (ECF No. 95 at 3-7). Pettaway testified that he was 38 years old, had graduated from high school, could read and write, and was able to read and understand the indictment and the plea agreement. (*Id.*). Pettaway further testified about mental health treatment that he was receiving in prison, explaining that his treatment started upon his incarceration in October 2008 and included both medication and periodic visits with a psychologist. (*Id.*). Pettaway was able to provide specific information regarding his medications, their dosages, and their administration schedule and intelligently discussed changes to his medication regimen over the years. Pettaway indicated that the medications were prescribed to treat his anxiety, sleep disturbances, attention deficit disorder, and related conditions. He added that he had requested more frequent counseling, but the prison had not yet honored that request. When the Court inquired as to whether any of Pettaway's

3

medications interfered with his ability to understand the proceedings, Pettaway confirmed that he understood the proceedings, the charges against him, and the terms of the plea agreement. (*Id.* at 7).

The Court then reviewed the first count of the indictment in detail, both reading the charge verbatim and taking time to explain to Pettaway the meaning of key terms. (*Id.* at 8-10). Pettaway acknowledged that he had discussed the indictment with his attorney and had shared with him the facts giving rise to the charges. (Id. at 9-10). Pettaway confirmed that his counsel had explained to him the nature of both charged offenses and had advised Pettaway of all possible defenses. (*Id.* at 10). After fully understanding the nature of the charge contained in the first count, Pettaway decided to enter a guilty plea to that offense.

The Court then reviewed the terms of the plea agreement, taking care to ensure that Pettaway understood the meaning and effect of each provision. (ECF No. 95 at 10-27). The Court verified Pettaway's concurrence with the facts set forth in the Stipulation and his understanding that if he withdrew from the agreement or breached its terms, the United States could still introduce the stipulation as evidence at trial. (*Id.* at 17-18). The Court reviewed the agreement with respect to the Sentencing Guidelines calculations, and Pettaway confirmed his understanding that the offense level might change after additional facts were collected, and that he had agreed to waive his right to appeal any sentence falling within the applicable range for an adjusted offense level of 14. (*Id.* at 18-21). After reviewing the remaining provisions, Pettaway confirmed that the plea agreement represented the sole and entire agreement between him and the United States; that he had signed the agreement and initialed each page; and that he approved of the agreement at the time it was reached, at the time he signed it, and at the present

time. (*Id.* at 27-28).

The Court queried Pettaway regarding his appreciation of the penalties associated with a conviction on the charge, as well as the civil and constitutional rights he would abandon by entering a guilty plea. (ECF No. 95 at 29-34). Pettaway expressed his understanding that he was entitled to the assistance of a lawyer at a trial; and that he had the right to a speedy and public trial by jury; to be confronted with and cross-examine witnesses; to choose not to testify; to be presumed innocent; and that at trial, it would be the Government's burden to prove his guilt beyond a reasonable doubt. (*Id.*). Pettaway knew that by pleading guilty, he was waiving these constitutional rights, in particular his right against self-incrimination and right to a trial by jury. (*Id.*). He denied having been made any promises by anyone of leniency, a light sentence, or probation outside of the contents of the plea agreement. (*Id.* at 34). Pettaway confirmed that his guilty plea was not made under threat, intimidation, coercion, or pressure to plead guilty. (*Id.* at 34-35). He also stated that he was satisfied with his attorney; that he felt that his attorney had represented him fully and fairly; and his attorney had spent a good deal of time with him developing his case. (*Id.* at 35). Pettaway again verified that the written plea agreement was the entire agreement between him and the United States, and there were no other side agreements; that his plea was voluntary and of his own free will; that he understood that he was waving his constitutional rights, including his right to a fair and speedy trial by jury; and that he had full knowledge of the consequences of his plea, including the possible five year maximum penalty that the Court could impose. (ECF No. 95 at 35-37). Pettaway then signed a written plea of guilty. (*Id.* at 37).

The Court asked Pettaway to state in his own words what he had done that made him guilty of the first count of the indictment. (*Id.*). Pettaway replied, "I sent the letter

out October 6, 2011. I mailed it out to the known person to do bodily harm to that person." Pettaway confirmed that he sent the letter to be delivered by the United States Postal Service to his ex-girlfriend's address in Huntington, West Virginia, and the letter contained a threat to injure her. (*Id.* at 37-39). The Court entered the letter into evidence, and Pettaway conceded that his girlfriend received the letter and gave it to the FBI. Finally, Pettaway admitted that at the time he wrote and mailed the letter, now entered into evidence, he understood what he was doing and intended to threaten his ex-girlfriend. (Id. at 41-42). Pettaway confessed that he was pleading guilty because he was, in fact, guilty of the charge contained in the first count of the Indictment. (ECF No. 95 at 43).

After again corroborating that Pettaway comprehended all of the proceedings that had taken place, the Court found that there was a factual basis for Pettaway's guilty plea, and it was entered freely and voluntarily, with full knowledge of the consequences of the plea, including the possible penalty that the Court might impose. *(Id.*). The Court found that the plea agreement adequately protected Pettaway's rights and was in the interests of justice; thus, the Court accepted Pettaway's plea and adjudged him guilty of the charge contained in the first count of the indictment. (*Id.*). The second count was dismissed.

On August 15, 2013, Pettaway appeared for sentencing. (ECF No. 96). He testified that he had read the probation department's presentence report and had gone over it thoroughly with his attorney. (*Id.* at 4). Pettaway's counsel raised objections to certain portions of the presentence report. Specifically, he argued that prior letters written by Pettaway, which were considered by the Probation Officer in determining relevant conduct, should not have been included in that analysis. In addition, counsel disagreed

with the Probation Officer's recommendation that Pettaway not receive a deduction under the Sentencing Guidelines for acceptance of responsibility. Counsel contended that Pettaway deserved the deduction given his guilty plea and expressions of remorse. (*Id.* at 5-14).

In response, the United States argued that the letters should be counted as a group under the Guidelines, because they were directed to the same victim and contained similar threats. Therefore, they qualified as relevant conduct. With respect to the deduction for acceptance of responsibility, the United States objected to a deduction, indicating that an inmate, Justin R. Dennison, had provided evidence establishing that Pettway continued to make threats against his ex-girlfriend. The United States offered Dennison as a witness at the sentencing hearing. (ECF No. 96 at 15-33).

On direct examination, Dennison testified that he had been recently incarcerated at Mount Olive Correctional Complex, at the same time as Pettaway. Dennison was familiar with Pettaway, because their ex-girlfriends were friends, and the four of them had socialized in the late 1990's. According to Dennison, he ran into Pettaway and asked him about his Quality of Life inmate classification. A few days later, Pettaway sent Dennison a packet containing Pettaway's disciplinary records and assorted documents pertaining to his federal charge. Pettaway also sent Dennison a note, explaining that his classification at Mount Olive was due to complaints made by his ex-girlfriend. In the note, Pettaway again made threats against his ex-girlfriend, Dennison's prior acquaintance. Dennison and Pettaway exchanged additional correspondence, including a second note written by Pettaway in which he stated that he had arranged with an individual on the outside to hurt his ex-girlfriend. (*Id.* at 15-24). After receiving the second note, Dennison was transferred to another correctional facility. Once

7

transferred, Dennison shared Pettaway's notes with the United States Attorney's Office. Dennison admitted that he decided to turn over the notes in hope that his cooperation would improve his chances of obtaining parole at an upcoming hearing.

On cross-examination, Dennison denied ever knowing that Pettaway was "mentally challenged" and had psychological issues. Dennison also denied being labeled as a jailhouse "snitch," testifying that his placement in protective custody was in punishment for gambling, and not to protect him from retaliation for prior episodes of snitching. Dennison disagreed with counsel's suggestion that Dennison had tricked Pettaway into making written threats. Dennison denied saving the threatening notes specifically to use the information to his advantage at the parole hearing. Instead, he testified that he originally kept Pettaway's notes with the intention of warning Pettaway's ex-girlfriend of the threats, but he later realized that he also might be able to help himself by turning them over. (*Id.* at 27-33).

After hearing the testimony, the Court took a ten-minute recess and then returned to render a decision. (*Id.* at 34).  The Court found that Pettaway had sent correspondence to Dennison in February 2013, setting forth a desire and plan to exact revenge on his ex-girlfriend. Based on Pettaway's recent threats, the Court concluded that Pettaway lacked remorse for the criminal activity that formed the basis of the plea agreement. Therefore, Pettaway was denied a deduction for acceptance of responsibility. (*Id.* at 35). However, the Court agreed with counsel's argument on relevant conduct and reduced Pettaway's criminal history category from category VI to category V. Consequently, with an offense level of 14 and a criminal history category of V, Pettaway's sentence range under the Guidelines was 33 to 41 months' imprisonment.

Before imposing sentence, the Court allowed Pettaway and his counsel an opportunity to make statements in mitigation. Counsel asked the Court to consider that Pettaway had borderline intellectual functioning, attention deficit disorder, depression, and anti-social personality disorder for which he was not receiving effective treatment. Counsel argued that Pettaway's psychological issues likely contributed to his behavior, and that fact should be taken into consideration when determining his sentence. (ECF No. 96 at 36-37). Counsel also pointed out that Pettaway still had a state sentence and another 24-month federal sentence to serve before the new sentence would begin to run. In view of the amount of time Pettaway had left to serve, counsel asked the Court to sentence him at the low end of the Guidelines range. Pettaway spoke next, apologizing for his behavior and advising the Court that he was trying to get additional help for his psychological problems. He also explained that he never really intended to hurt his ex-girlfriend; rather, he became frustrated with incarceration and thoughtlessly wrote the threatening letters.

After considering the arguments and statements, the Court imposed a sentence of 39 months in prison, which would run consecutively to Pettaway's other sentences. (*Id.* at 43-46). The Court noted that Pettaway's conduct was very serious and had caused his victim and her family to live in terror for a number of years. The Court expressly confirmed its consideration of the factors under Section 3553(a), as well as Pettaway's mental health issues and the potential for an upward variance under the Guidelines due to the long-term and repetitive nature of Pettaway's threats. The Court further directed a $100 special assessment to be paid out of Pettaway's prison earning at a rate of $10 per month until paid in full, but declined to impose any additional fines, restitution, or costs in light of his limited earning capacity. (*Id.* at 46).

9

On August 26, 2013, Pettaway filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), arguing that the sentencing court should have given him a two-level deduction for acceptance of responsibility and improperly ran his sentence consecutively to his prior state and federal sentences. (ECF Nos. 80, 99). On March 10, 2014, finding no error by the District Court, the Fourth Circuit affirmed the sentence. (ECF No. 99). On January 29, 2015, Pettaway timely filed the present action seeking to set aside his conviction. (ECF No. 103).

## II. <u>Movant's Grounds for Vacating, Setting Aside, or Correcting His Sentence.</u>

Pettaway raises four grounds in support of his § 2255 Motion, all of which are based on alleged violations of the Sixth Amendment to the United States Constitution, including the following:

1. His counsel was ineffective by failing to "get the defendant off the charges listed." (ECF No. 103 at 4).

2. His counsel was ineffective by failing to request an examination under 18 U.S.C. § 4241 to ascertain Pettaway's competence. (*Id.* at 5).

3. His counsel was ineffective by failing to get an "informant" removed from the sentencing hearing and having his testimony stricken from the record. (*Id.* at 7).

4. His counsel allowed "bad information" to be introduced into the record, resulting in Pettaway's conviction. (*Id.* at 8).

## III. <u>Relevant Law</u>

A motion made pursuant to 28 U.S.C. § 2255 is a collateral attack on a conviction or sentence imposed in a separate proceeding. *Wall v. Kholi*, 562 U.S. 545, 552 (2011). To succeed on collateral attack, the movant must prove by a preponderance of the evidence that one of the following occurred: (1) the conviction or sentence was imposed in violation of the laws or Constitution of the United States; (2) the Court imposing the

10

sentence lacked jurisdiction; (3) the sentence exceeded the maximum authorized by law; or (4) the sentence was otherwise subject to collateral attack. 28 U.S.C. § 2255; *see, also, Sutton v. United States of America,* No. CRIM.A. 2:02CR65, Civ.A. 2:05CV91, 2006 WL 36859, at *2 (E.D. Va. Jan. 4, 2006) ("A motion collaterally attacking a prisoner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence.").

When a movant alleges ineffective assistance of counsel under § 2255, the movant claims a violation of rights guaranteed by the Sixth Amendment. *Strickland v. Washington,* 466 U.S. 668, 680 (1984). Under *Strickland,* a criminal defendant can prove ineffective assistance of counsel by meeting the requirements of a two-prong test. *Id.* at 687. The defendant carries the burden of satisfying both prongs of the test, and "a failure of proof on either prong ends the matter." *United States v. Roane,* 378 F.3d 382, 404 (4th Cir. 1994).

First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687-88. When evaluating counsel's performance under the first prong of *Strickland,* "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689. Thus, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The inquiry under Strickland is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter,* 562 U.S. 86, 88 (2011).

Second, the defendant must show that he was actually prejudiced by the ineffective assistance of counsel. *Strickland,* 466 U.S. at 687. To establish actual prejudice from counsel's deficient performance, "[p]etitioner must show that 'counsel made errors so serious that counsel was not functioning as the counsel guaranteed ... by the Sixth Amendment.'" *DeCastro v. Branker,* 642 F.3d 442, 450 (4th Cir. 2011) (citing *Harrington,* 131 S.Ct. at 787)); *see, also, Strickland,* 466 U.S. at 687 (holding that the second prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"). It is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Strickland,* 466 U.S. at 693. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In the context of a guilty plea, the movant carries a heavy burden under § 2255. By entering a guilty plea, the criminal defendant "has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged." *Tollett v. Henderson,* 411 U.S. 258, 267 (1973). Therefore, a guilty plea "represents a break in the chain of events which has preceded it in the criminal process." *Id.* Statements made during a hearing to accept a guilty plea are afforded a strong presumption of veracity and subsequent attacks that contradict these statements may generally be dismissed as frivolous. *U.S. v. Lemaster,* 403 F.3d 216, 221-222 (4th Cir. 2005). As the Fourth Circuit explained:

[A] defendant's solemn declarations in open court ... carry a strong

> presumption of verity ... because courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy. ... Thus, in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements.

*Id.* Consequently, a criminal defendant is precluded from raising alleged constitutional deprivations that occurred prior to pleading guilty and "may only attack the voluntary and intelligent character of the guilty plea" by demonstrating that his counsel's performance was inadequate under the Sixth Amendment. *Tollett v. Henderson,* 411 U.S. at 267; *see, also*, *Fields v. Attorney General of State of Md.,* 956 F.2d 1290, 1296 (4th Cir. 1992)("A guilty plea does not bar collateral review of allegations of ineffective assistance of counsel in so far as the alleged ineffectiveness bears on the voluntariness of the guilty plea."). In other words, the movant under § 2255 must not only rebut the presumption that counsel performed within the wide range of reasonable professional competence, but must also demonstrate that "there is a reasonable probability that, but for counsel's errors, [movant] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985).

## IV.   <u>Analysis</u>

### A.  **Ineffective Assistance Resulting in a Conviction**

For his first ground, Pettaway asserts that his counsel was ineffective because he failed to get Pettaway "off the charges listed and resulted in a conviction." (ECF No. 103 at 4). As Pettaway offers no argument or factual basis to support this ground for relief, the undersigned **FINDS** that Pettaway fails to establish either prong of the *Strickland* test. As the United States points out, Pettaway was charged with two counts of sending threatening letters to his ex-girlfriend. The evidence against Pettaway was

overwhelming. Not surprisingly, he decided to plead guilty to one of the two counts and admitted to his criminal behavior in open court. In light of Pettaway's plea, counsel was hard-pressed to achieve a full acquittal.  In any event, to establish ineffective assistance of counsel, Pettaway must show that his counsel's performance fell outside the scope of reasonable professional assistance; such a showing is not made simply by pointing to an unsuccessful outcome.

### B.  Failure to Request an Examination under 18 U.S.C. § 4241

For his second ground, Pettaway claims that his counsel was ineffective for not requesting a competency hearing under 18 U.S.C. § 4241. A criminal defendant's guilty plea is only constitutionally valid "to the extent it is voluntary and intelligent." *Bousley v. United States*, 523 U.S. 614, 618 (1998). The standard for determining a defendant's competence to enter a guilty plea is the same as the standard for determining competency to stand trial. *Godinez v. Moran*, 509 U.S. 389, 397-99 (1993). The defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Id.* at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960). "[I]f there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," a court may grant a motion seeking—or may *sua sponte* order—a competency hearing under 18 U.S.C. § 4241. *See* 18 U.S.C. § 4241. "An attorney's duty, of course, does not mandate the exploration of the issues of sanity and/or competency in every instance." *Wood v. Zahradnick*, 430 F.Supp. 107, 111 (E.D. Va. 1977), aff'd, 578 F.2d 980 (4th Cir. 1978).

Instead, defense counsel's responsibility to investigate his client's competency arises only when "the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition." *Id.*

In this case, Pettaway offers no evidence to establish that his behavior, communications with the court or counsel, or psychiatric history were sufficiently abnormal to trigger reasonable doubt on the part of counsel regarding Pettaway's mental competency. Indeed, while the presentence investigation report demonstrated Pettaway's long history of anxiety, depression, anger management issues, attention deficit disorder, and anti-social personality disorder, it also confirmed Pettaway's ongoing treatment for those conditions and his insight into the need for continued therapy. While Pettaway had been awarded social security disability benefits in the past, those benefits were based upon his borderline intellectual functioning, not his psychiatric conditions. Moreover, no record available to the Probation Officer or counsel demonstrated a prior history of mental incompetency. Further, in the course of considering Pettaway's guilty plea, the Court conducted a thorough Rule 11 hearing and fully explored Pettaway's mental health history and understanding of the proceedings. Pettaway's responses to the questions posed by the Court and defense counsel revealed no difficulty on Pettaway's part in understanding the nature of the charges or the consequences of his guilty plea. In sum, the record lacks any signs or symptoms suggesting the need for a mental competency examination.

In addition to the presentence report, the transcript of the Rule 11 hearing provides significant evidence of Pettaway's competency. A Rule 11 colloquy is designed to ensure that a guilty plea is both intelligent and voluntary. *See United States v. Vonn,* 535 U.S. 55, 58 (2002); *Brady v. United States,* 397 U.S. 742, 748 (1970). When

accepting a guilty plea, the presiding judge must address the defendant personally in open court and inform him of the rights that he is waiving by entering a guilty plea. *Fed. R. Crim. P.* 11(b). Thus, "[p]rior to accepting a guilty plea, a trial court, through colloquy with the defendant, must inform the defendant of, and determine that he understands, the nature of the charge(s) to which the plea is offered, any mandatory minimum penalty, and the maximum possible penalty and various rights." *United States v. DeFusco,* 949 F.2d 114, 116 (4th Cir. 1991) (citing *Fed. R. Crim. P.* 11(c)(1)). The court also must determine whether there is a factual basis for the plea and ensure that the plea did not result from force, threats, or non-plea agreement promises. *Id.* at 120. If the defendant fails to understand his constitutional protections and the charges made against him, the guilty plea is invalid and should not be accepted. *Henderson v. Morgan,* 426 U.S. 637, 645 (1976). Claims of incompetence "can raise issues of both procedural and substantive due process." *Burket v. Angelone*, 208 F.3d 172, 191 (4th Cir. 2000).

### 1. Procedural Competency Claim

Under a procedural competency claim, the relevant issue is whether "the trial court failed to hold a competency hearing after the defendant's mental competency was put in issue." *Id.* at 192; *see also Godinez*, 509 U.S. at 408 ("Trial courts have the obligation of conducting a hearing whenever there is sufficient doubt concerning a defendant's competence."). As an example, the Fourth Circuit has held that when a criminal defendant informs the district court at a Rule 11 hearing that he is under the influence of medication, the district court should "inquire about what effect, if any [the defendant's] medication ha[s] on his ability to make a voluntary plea and to understand the consequences." *United States v. Damon*, 191 F.3d 561, 565 (4th Cir. 1999); *see also United States v. Nicholson*, 676 F.3d 376, 382-83 (4th Cir. 2012). Nevertheless, there is

no mandatory method by which to conduct the Rule 11 colloquy; instead, "[t]he manner of ensuring that the defendant is properly informed is committed to the good judgment of the district court, to its calculation of the relative difficulty of comprehension of the charges and of the defendant's sophistication and intelligence." *United States v. Reckmeyer,* 786 F.2d 1216, 1221 (4th Cir. 1986) (*citing United States v. Dayton,* 604 F.2d 931, 938 & n. 11 (5th Cir.1979) (en banc)). The trial court need only inquire into a criminal defendant's competence when a response in a plea colloquy raises a red flag as to his competence to plead guilty. *Nicholson*, 676 F.3d at 383 (holding that defendant was not entitled to a competency hearing despite admitting to having taken "pain pills" during the past 24 hours, because his answers to the trial court's follow-up questions raised no red flags); *United States v. Shiflett*, 258 Fed. Appx. 560, 563 (4th Cir. 2007) ("[N]one of the answers provided by [defendant] or his counsel raised any 'red flags' regarding adverse effects on his mental state that may have resulted from the prior use of medication."); *but see Damon*, 191 F.3d at 565 (holding that the defendant's admission that "he was 'currently' under the influence of antidepressant medication," combined with his lawyer's statements that "he thought the name of the drug was Elantin 'or something of that nature" and that "'impaired judgment' was listed as a side effect," should have raised a red flag for the district court regarding the defendant's competence to plead guilty).

Here, the presiding district judge specifically addressed Pettaway's mental health at the Rule 11 hearing, repeatedly verifying that Pettaway understood the nature of the proceedings and the consequences of his guilty plea. The Court asked Pettaway whether he had ever received treatment of any kind during the prior three years, to which Pettaway responded that he saw a psychologist every three months and had been using

the same psychotropic medications since October 2008. (ECF No. 95 at 4). Pettaway was able to provide the Court with the names of his medications, the precise dosages he received, and the schedule on which the medications were administered. In addition, he confirmed that the medications helped him. Pettaway reviewed with the Court changes in his medication regimen that had occurred over time and expressed a desire for more frequent therapy, demonstrating insight into his emotional challenges. The Court inquired as to whether Pettaway had taken any new medications or sedatives during the previous 48 hours, to which Pettaway responded in the negative.

The Court proceeded to go through the plea agreement paragraph by paragraph, explaining the meaning of key terms and confirming Pettaway's comprehension of each paragraph along the way. Pettaway asked logical questions and provided rational answers. The transcript of the hearing reflects the great pains taken by the Court to ensure that Pettaway understood the proceedings, the charges, and the nuances of his plea agreement. (*Id.*at 7-27). Significantly, Pettaway never displayed any confusion over the information communicated by the Court, and neither Pettaway nor his counsel expressed concern with Pettaway's ability to comprehend the information. Likewise, nothing about Pettaway's behavior or testimony during the Rule 11 hearing indicated that he was anything other than competent. See *Beck v. Angelone*, 261 F.3d 377, 387 ("Although there are no 'fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed' proof 'of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant.'") (quoting *Drope v. Missouri,* 420 U.S. 162, 180 (1975)). Throughout the plea hearing, the Court consistently sought and received confirmation from Pettaway that he understood the elements of the charge to which he was pleading;

the provisions contained in the plea agreement; the sentence and penalties he exposed himself to by pleading guilty; the purpose and effect of the advisory sentencing guidelines; and the consequences of pleading guilty including the rights he would be waiving. Simply put, Pettaway's statements during the Rule 11 colloquy did not raise any red flags that should have suggested to the Court, or counsel, that Pettaway was incompetent to enter a guilty plea.

### 2. Substantive Competency Claim

Under a substantive competency claim, the movant essentially alleges "that he was, in fact, tried and convicted while mentally incompetent." *Beck*, 261 F.3d at 387-88 (internal quotations omitted). "A petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence." *Id.* at 388. "'Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'" *Burket,* 208 F.3d at 192 (quoting *United States ex rel. Foster v. DeRobertis,* 741 F.2d 1007, 1012 (7th Cir.1984)). Similarly, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003) (quoting *Burket,* 208 F.3d at 192).

As discussed above, there is simply no evidence in the record, let alone a preponderance, to support Pettaway's claim that his competency should have been questioned. Similarly, no evidence exists that Pettaway was incompetent when he entered his guilty plea. To the contrary, the record of the Rule 11 hearing reflects a thorough colloquy, during which the presiding district judge appropriately probed Pettaway's mental status and then fully advised him of the nature of the charge against

him, the mandatory minimum and maximum penalties, the constitutional and civil rights lost by entering a guilty plea, and the effect and consequences associated with the plea agreement and Stipulation of Facts. Moreover, "[t]hroughout this colloquy, the district judge had an opportunity to observe [petitioner's] demeanor and tone in response to these questions before deciding to accept [his] plea as knowing and voluntary." *See United States v. Hebron*, 442 Fed. Appx. 887, 890 (4th Cir. 2011) (rejecting a petitioner's substantive competency claim based upon her conduct during the Rule 11 plea colloquy).

Considering Pettaway's testimony and behavior during the Rule 11 hearing, it is clear that Pettaway's psychological conditions, borderline intellectual functioning, and use of psychotropic medications did not render him incompetent at the time he pled guilty. Moreover, Pettaway acknowledged his understanding of the consequences of his guilty plea and affirmed that his decision to plead guilty was made freely, voluntarily, and after due consideration. Therefore, the undersigned **FINDS** that (1) counsel was not ineffective by failing to request a mental competency examination; (2) Pettaway was competent to plead guilty at the time of his Rule 11 hearing, and (3) his guilty plea was voluntary and intelligent.

### C.  Failure to Remove an Unreliable Informant and Strike Testimony

Pettaway's third and fourth grounds for relief involve the testimony of Justin Dennison at the sentencing hearing. Pettaway argues that his counsel established during cross-examination that Dennison was testifying for the prosecution in order to receive assistance at an upcoming parole hearing. Nevertheless, counsel was ineffective by failing to have Dennison removed from the proceeding and the testimony stricken from the record. Pettaway claims that his counsel should have had the evidence "suppressed,"

and his failure to do so resulted in Pettaway's conviction. Pettaway contends that substantial law prohibits the introduction of "tainted" testimony from compromised informants. (ECF No. 103 at 7-8).

Although Pettaway is correct that the Fourth Circuit has "regularly reviewed trials in which paid government informants served as witnesses, considering such issues as paid informants' competency as witnesses, their credibility, the necessity for cautionary jury instructions regarding their credibility, and the disclosure of their status to the defense . . . [i]n none of the cases did [it] express any doubt about the legality of the practice." *United States v. Anty*, 203 F.3d 305, 310 (4th Cir. 2000). In fact, "granting a witness lenient treatment in exchange for his testimony against a defendant is not improper." *United States v. Johnson*, 1995 WL 561302, at *1 (4th Cir. Sept. 22, 1995) (unpublished) (citing *United States v. Mitchell,* 886 F.2d 667, 670 (4th Cir. 1989)). Moreover, Dennison's testimony was not offered to convict Pettaway of a crime; rather, Dennison provided evidence relevant to a sentencing issue. As the United States emphasizes, at sentencing, the court is entitled to consider "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has a sufficient indicia of reliability to support its probable accuracy." *United States v. Hernandez-Villanueva,* 473 F.3d 118, 122 (4th Cir. 2007). District courts have wide latitude to consider witness testimony at sentencing, "even if the testimony was inconsistent or otherwise questionable." *United States v. Dieguez*, 633 Fed. Appx. 106, 109 (4th Cir. 2015), *cert. denied,* 137 S. Ct. 245, 196 L. Ed. 2d 186 (2016). Accordingly, the mere fact that Dennison sought assistance with parole in exchange for testifying against Pettaway does not constitute grounds for striking the testimony or removing Dennison as a witness. The law is well settled that an attorney

does not provide ineffective assistance under *Strickland* by failing to make a frivolous or futile motion. *See Moody v. Polk,* 408 F.3d 141, 151 (4th Cir. 2005) (citing *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir. 1984)). Consequently, the undersigned **FINDS** that counsel's performance in relation to Justin Dennison's testimony at the sentencing hearing fell within the broad range of effective assistance of counsel and does not provide a ground for vacating Pettaway's conviction or sentence.

## V.    Proposal and Recommendations

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the District Court accept and adopt the findings proposed herein and **RECOMMENDS** the following:

1.    Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255  (ECF No. 103) be **DENIED**; and

2.    This civil action be **DISMISSED, with prejudice,** and removed from the docket of this Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three additional days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Movant, Respondent, and any counsel of record.

**FILED**:  February 1, 2017

Cheryl A. Eifert
United States Magistrate Judge

23